# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. JESUS ADAM LIZARRAGA, Defendant. | No. 15-CR-2027-CJW-MAR<br><br>MEMORANDUM OPINION & ORDER |

## I. INTRODUCTION

This matter is before the Court on defendant's Amended Motion for Compassionate Release filed on October 27, 2020. (Docs. 72 & 73). On November 3, 2020, the government timely filed a resistance. (Doc. 74). On November 9, 2020, defendant timely filed a reply, which he supplemented the next day. (Docs. 75 & 76). For the following reasons, the Court **denies** defendant's motion.

## II. RELEVANT BACKGROUND

From as early as December 2013 to June 28, 2015, defendant and others conspired to distribute 500 grams or more of a mixture or substance containing 50 grams or more of actual (pure) methamphetamine. (Doc. 37, at 4). In late 2013, defendant, a resident of California, recruited distributors in Iowa to distribute ice methamphetamine in Iowa on his behalf. (*Id.*). On at least three occasions, defendant met up with these distributors in Omaha, Nebraska and supplied them with three to five pounds of ice methamphetamine each time. (*Id.*). In 2014, one Iowa distributor, S.W., made two trips to California to pick up ice methamphetamine from defendant and his associates. (*Id.*, at 4–5). While returning from the second pick-up, S.W.'s car broke down in Nevada, and officers

discovered the drugs in her vehicle. (*Id.*, at 5). In early 2015, S.W. cooperated with officers, and officers ultimately recorded defendant selling her another pound of ice methamphetamine in Cedar Falls, Iowa. (*Id.*). In June 2015, officers arrested defendant when he attempted to sell two more pounds of ice methamphetamine to S.W. in Cedar Falls. (*Id.*, at 6). Between defendant's vehicle and his hotel room, officers discovered five packages of ice methamphetamine. (*Id.*, at 6–7). Throughout the conspiracy, defendant also directed S.W. to make financial transfers to conceal payments relating to the conspiracy, at least one of which involved an international bank. (*Id.*, at 5–7).

On July 29, 2015, a grand jury issued an Indictment charging defendant with one count of conspiracy to distribute methamphetamine in violation of Title 21, United States Code, Section 846, one count of distribution of methamphetamine in violation of Section 841, and one count of possession with intent to distribute methamphetamine in violation of Section 841. (Doc. 2). On September 15, 2015, a grand jury issued a Superseding Indictment which additionally charged defendant with money laundering in violation of Title 18, United States Code, Section 1956(a)(3)(B). (Doc. 15). On November 2, 2015, defendant pled guilty to the conspiracy and money laundering charges under a plea agreement with the government. (Docs. 27, 30, & 31).

On January 11, 2016, the United States Probation Office filed defendant's final presentence investigation report. (Doc. 37). Defendant was, at that time, 35 years old. (*Id.*, at 2). Defendant was raised by his mother, who was now deceased. (*Id.*, at 13). Defendant described his father as a severe alcoholic and stated that he had no contact with his father until he was 15 years old. (*Id.*). Defendant had one child from a previous relationship with whom he maintained regular contact. (*Id.*). Defendant attempted several times to complete his high school education but had not yet done so. (*Id.*, at 17). Defendant reported that he had been self-employed since 2008, either through vehicle

sales or music recording. (*Id.*, at 18). Despite this, defendant had no reported income since 2008. (*Id.*).

Other than significant lower back pain, defendant was in good physical health. (*Id.*, at 14–15). Defendant had no formal mental health diagnoses, but stated that he suffered from depression, anxiety, and some minor suicidal ideation, particularly after his mother's death. (*Id.*, at 15). Defendant described himself as a binge gambler, a severe alcoholic, and a regular user of marijuana, unprescribed pain medications, and diet pills. (*Id.*, at 15–17). Defendant had also occasionally used cocaine, used methamphetamine on ten occasions, and tried ecstasy. (*Id.*, at 16). Defendant had twice completed substance abuse treatment, once in 2003 and 2006 respectively. (*Id.*, at 17). Defendant's criminal history was relatively minor but characterized by alcohol abuse. He had two prior convictions for driving while under the influence of alcohol in 2003 and 2006 respectively. (*Id.*, at 10). He also had convictions for disturbing the peace in 2008 and public intoxication in 2013. (*Id.*, at 11).

On February 22, 2016, the Court sentenced defendant. (Doc. 42). Defendant was in criminal history category I with a total offense level of 38, yielding an advisory guideline range of 235 to 293 months' imprisonment followed by at least five years on supervised release. (Doc. 37, at 20). The Court ultimately sentenced defendant to 264 months' imprisonment followed by five years on supervised release on the conspiracy offense and 240 months' imprisonment followed by three years on supervised release on the money laundering offense, with both counts to run concurrently. (Doc.43). Defendant timely appealed his sentence to the Eighth Circuit Court of Appeals but was unsuccessful. (Docs. 46 & 60). Defendant then petitioned to the United States Supreme Court for a writ of certiorari but was denied. (Docs. 64 & 65).

On August 6, 2020, defendant filed a pro se motion for compassionate release in this Court, which he later supplemented. (Docs. 68 & 69). After the Court appointed

counsel to defendant (Doc. 70), defendant filed his Amended Motion for Compassionate Release now before the Court (Docs. 72 & 73). Defendant is currently incarcerated at Loretto FCI in Loretto, Pennsylvania with a projected release date of March 27, 2034.[1]

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons ("BOP")] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Although some courts disagree, this Court holds that defendants are not required to administratively appeal a warden's denial and may satisfy Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion for compassionate release in the courts. *United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

---

[1] *Find an Inmate*, BOP, https://www.bop.gov/inmateloc/.

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

United States Sentencing Guidelines ("USSG") Section 1B1.13 defines "extraordinary and compelling reasons" as used in Section 3582(c)(1)(A)(i). Section 1B1.13 provides that such reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physical or mental deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; or (5) is experiencing some other extraordinary and compelling reason as determined by the BOP. Although some courts disagree, this Court holds that Section 1B1.13 is not binding because it predates the First Step Act of 2018's amendments to Section 3582(c)(1)(A) which enabled defendants to bring motions for compassionate release on their own behalf. *United States v. Crandall*, No. 89-CR-21-CJW-MAR, 2020 WL 7080309, at *5 (N.D. Iowa Dec. 3, 2020). The Court recognizes, however, that Section 1B1.13 should still be considered a helpful guidepost in determining whether extraordinary and compelling reasons exist to release a defendant. *Id.*

5

## IV. DISCUSSION

### A. *Exhaustion of Administrative Remedies*

In his pro se motion for compassionate release filed on August 6, 2020, defendant represented that he had "exhausted [his] administrative remedies here at Loretto FCI." (Doc. 68). In his pro se supplement filed on August 24, 2020, defendant clarified that he had not yet exhausted administrative remedies but that he will have exhausted such remedies by August 27, 2020, due to the lapse of 30 days. (Doc. 69). In his Amended Motion for Compassionate Release, defense counsel states that defendant "verified in a phone conversation . . . that he believed he had given a request form to his case manager directed to the Warden of FCI Loretto" but that counsel "ha[d] not been able to recover documentary verification of [defendant's] request[.]" (Doc. 73, at 5). The only documentation defendant cites is a note in his administrative file that a "home confinement request" was submitted on August 5, 2020, and later denied. (*Id.*); *see also* (Doc. 73-3). Were this defendant's only evidence of exhaustion, the Court would find it insufficient. The note in defendant's file alone does not provide the Court with sufficient information about the nature of the request, the grounds for it, or who reviewed it, all of which are critical in determining whether exhaustion has been fulfilled under Section 3582(c)(1)(A).

Defendant also, however, submitted a documented request to the warden of his facility on October 27, 2020. (Doc. 73-6). The warden denied defendant's request on October 30, 2020. (Doc. 76). Because 30 days have elapsed since defendant submitted his request to the warden, the Court finds he has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).

### B. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his hypertension, "previous mild heart attack," edema, and weight put him at a

6

high risk of severe complications and death if he contracts COVID-19. (Doc. 73, at 10–14). Currently, 75 inmates at Loretto FCI have tested positive for COVID-19 and another 54 have recovered, but none have died.[2] Further, 21 staff members have tested positive and another four have recovered, but none have died. *Id.*

The presence of COVID-19 at a defendant's specific facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases). The Centers for Disease Control and Prevention ("CDC") recognizes that pulmonary hypertension increases a person's risk of severe outcomes from COVID-19 and that other forms of hypertension may do so as well.[3] Having a serious heart condition also increases a person's risk. *Id.* The CDC also recognizes that persons with a body mass index ("BMI") in excess of 30 are at an increased risk. *Id.* The CDC does not list edema as actually or potentially increasing a person's susceptibility to COVID-19. *Id.* A person's susceptibility to COVID-19 also increases with their age.[4] Eight out of ten deaths related to COVID-19 in the United States have been in adults older than 65. *Id.* Persons over age 85 are at "[t]he greatest risk for severe illness from COVID-19." *Id.*

Defendant will soon be 40 years old. (Doc. 37, at 2). Thus, although the Court notes his age, defendant is not in or close to being in a high-risk age group.

---

[2] *COVID-19*, BOP, https://www.bop.gov/coronavirus/.

[3] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (Dec. 1, 2020).

[4] *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (Nov. 27, 2020).

Defendant's medical records show he suffers from essential hypertension, not pulmonary hypertension. (Doc. 73-1, at 4, 14, 16, 17, 33, 35).[5] His records do not discuss his condition with any emphasis, although it is noted that he receives chronic care. (*Id.*, at 17). His only blood pressure reading in the record is 132/80 from March 23, 2020, which puts him in hypertension stage I. (*Id.*, at 13).[6] Generally, the Court has only afforded essential hypertension significant weight in its analysis when the defendant's hypertension is consistent and severe. *See United States v. Clutts*, No. 18-CR-70-CJW-MAR, 2020 WL 6531915, at *6 (N.D. Iowa Nov. 5, 2020). Here, defendant's condition does not appear to be severe. Moreover, the Court does not have enough information to find that defendant is consistently in stages of hypertension. Thus, although the Court recognizes that essential hypertension is a potential risk factor, it affords this condition little weight here.

Defendant's report that he suffered a "previous mild heart attack" is not reflected in the record. (Doc. 73, at 10). Rather, defendant merely reported this to his attorney over the phone. (*Id.*); *see also* (Doc. 68). It is not clear when this heart attack allegedly occurred, whether defendant received medical attention, or if he received a formal diagnosis. Moreover, his medical records indicate he has not reported any cardiovascular issues. *See, e.g.*, (Doc. 73-1, at 18). Given that the record does not support a finding that defendant has a serious heart condition, the Court affords this condition little weight.

---

[5] In his motion, defendant states that he is being treated for "essential pulmonary hypertension." (Doc. 73, at 10). Given that such hypertension is not mentioned again in his motion or in his medical records, it appears this is merely a typographical error and counsel meant to cite defendant's "essential *primary* hypertension."

[6] *See also Understanding Blood Pressure Readings*, American Heart Association, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings.

8

Although defendant's records reflect that he has edema in his legs (*Id.*, at 4, 14, 16, 28, 33, 35, 53), this condition is not recognized by the CDC as being relevant to COVID-19. Thus, the Court also affords this condition little weight.

Defendant's most recent weight in the record from March 23, 2020, puts him at 244 lbs. (*Id.*, at 14). Given his height of 6' 3'' (Doc. 37, at 2), defendant's BMI is roughly 30.5.[7] His weight is not otherwise discussed in his records. Defendant's BMI barely exceeds the CDC's 30 BMI risk threshold. Thus, consistent with the CDC's guidance, the Court finds that defendant's weight is a risk factor. The Court affords this condition only minor weight, however, given that defendant's weight is in the risk category by a thin margin and not otherwise discussed with concern in his records.

On balance, the Court finds defendant has not presented an extraordinary and compelling reason for release. He has cited one potential risk factor (his hypertension) that does not appear to be particularly serious and one actual risk factor (his weight) which barely meets the CDC's guidance. The Court finds that the combination of these two conditions, even in light of defendant's other cited health conditions and the status of the virus at his facility, does not so substantially elevate his risk during the pandemic that release is warranted. The Court will, however, analyze defendant's motion under Section 3553(a) as if he had presented an extraordinary and compelling reason for release.

### C. *Section 3553(a) Factors and Danger to Community*

Defendant argues the Section 3553(a) factors favor release. (Doc. 73, at 14–16). Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider

---

[7] *Calculate Your Body Mass Index*, National Heart, Lung, and Blood Institute, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.

the factors set forth in Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Defendant's offense is undoubtedly serious. He was the leader of a conspiracy to distribute substantial quantities of methamphetamine across multiple states. He recruited others in the conspiracy and often directed their criminal activity. Defendant himself transported and sold methamphetamine. He directed the flow of cash within the conspiracy to obfuscate the fact that the money was earned through the sale of methamphetamine. Although defendant had other substance abuse issues, he was not a methamphetamine addict and acted only out of a desire to earn money. Admittedly though, as defendant notes, there is no indication that violence, firearms, or other aggravating factors were present here. (Doc. 73, at 15). Overall, the drug operation that defendant ran was sophisticated, widespread, and highly aggravating despite the absence of violence. Thus, although defendant quarrels with the calculation of his guideline range under the USSG (*Id.*), the Court finds the sentence defendant received appropriate in light of the offense conduct. This is true even considering defendant's negligible criminal history and substance abuse issues.

In his allocution at sentencing, defendant apologized for his offense and dedicated himself to rehabilitation through education:

10

> I never really seen people lose their—their teeth and stuff like that; how bad the drug was—the drug that I was selling. And I understand how much damage I caused them; how much damage I caused society and I'm just willing to . . . try to better myself in prison . . . and use education as a key[.] . . . [A]nd I just got to apologize[.] . . . I'll find a way to make it up and show [my son] that—that this is not an end. There's never an end and through education I think is going to be my—my key . . . to win this problem and—and come out successful[.]

(Doc. 57, at 5). Defendant's rehabilitation while incarcerated shows his allocution was sincere. Defendant has obtained his GED, completed at least 42 educational courses in a wide variety of studies, and completed drug treatment early. (Doc. 73-4). He currently works as an education orderly. (*Id.*). He has not received any disciplinary reports. (Doc. 73-2). Defendant also proposes a promising release plan. (Doc. 73-5). Without question, defendant should be proud of all he has accomplished while in prison.

That said, defendant has served roughly only six years of his 22-year term of incarceration. His projected release date is a little more than 13 years away. The Court finds, even considering defendant's impressive rehabilitation, that such a substantial sentence reduction is not warranted here. Doing so would fail to reflect the seriousness of the offense, promote respect for the law, or provide just punishment and would cause defendant's sentence to become disparate from the sentences of other, similarly situated defendants. *United States v. Vanatti*, No. 1:18-CR-00027-CJW-MAR-1 (N.D. Iowa Oct. 22, 2020) (Doc. 65, at 13) ("The Court recognizes . . . it has the authority to grant release regardless of the amount of time left to serve on a defendant's term of incarceration. The Court has often turned to the remainder of a defendant's term of imprisonment, however, as reflecting many of the goals of Section 3553(a)[.]") (citations omitted). The Court hopes defendant will continue to take advantage of the educational and rehabilitative opportunities available to him at his facility.

## V. CONCLUSION

For these reasons, defendant's Amended Motion for Compassionate Release (Doc. 72) is **denied**.[8] Defendant must serve the remainder of his term of imprisonment as previously directed. (Doc. 43).

**IT IS SO ORDERED** this 14th day of December, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[8] To the extent defendant's pro se motion for compassionate release (Docs. 68 & 69) is not superseded by his amended motion, the Court **denies** it as duplicative.